**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SEAN WAGNER, | ) | |
| Individually and On Behalf of All Others | ) | |
| Similarly Situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-CV-10961 |
| | ) | |
| GENERAL NUTRITION CORPORATION, | ) | Hon. Amy J. St. Eve |
| | ) | |
| Defendant. | ) | |

**MEMORANUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Defendant General Nutrition Corporation ("GNC") has moved to deny class certification

and dismiss Plaintiff Sean Wagner's ("Plaintiff") Class Action Complaint ("CAC") under

Federal Rules of Civil Procedure 12 and 23.  (R. 11.)  For the following reasons, the Court denies

GNC's motion.

**BACKGROUND**[1]

**I.      Plaintiff's Factual Allegations**

GNC is a large retailer of dietary supplements.  (R. 1, CAC, ¶ 2.)  Among the

supplements GNC markets are Pro Performance L-Glutamine Powder 5000, Pro Performance L-

Glutamine 1500, Pro Performance RapidDrive Glutamine 2500 Power Chew, and Pro

Performance RapidDrive Glutamine 5000 (the "Products").  (*Id.*)

---

[1] The Court takes the facts presented in the Background from the CAC and presumes them as true for the purpose of resolving the pending motion to dismiss under Rule 12(b)(6).  *See Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 823 (7th Cir. 2014); *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665–66 (7th Cir. 2013); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Plaintiff is an Illinois citizen who purchased GNC's Pro Performance L-Glutamine Powder 5000 dietary supplement for his own use at a GNC retail store in Chicago for about $29.99. (*Id.* at ¶ 15.) He claims that he purchased and consumed the supplements "because [he] believed, based upon the misleading labels, that they enhanced muscle growth, provided faster recovery, and had anti-catabolic properties." (*Id.* at ¶ 35.)

The glutamine Products come in at least two forms—a chewable tablet or a powder. (*Id.* at ¶ 22.) The Products' labels indicate that the Products (1) have "Anti-Catabolic Effects," (2) "Support[] Muscle Function," and/or (3) "Support[] Faster Recovery After Workouts." (*Id.*) Recovery "is the process of the fatigued muscles to recuperate and grow after resistance training," enabling further muscle growth. (*Id.* at ¶ 24.) "'Anti-Catabolic' refers to the ability of a product to decrease muscle wasting in the user during exercise." (*Id.* at ¶ 25.)

Glutamine[2] "is a naturally-occurring, nonessential, neutral amino acid." (*Id.* at ¶ 6.) It is a constituent of proteins and is important "as a means of nitrogen transport between tissues." (*Id.*) "It is 'nonessential' because the human body produces its own glutamine." (*Id.*) Plaintiff alleges that many people, particularly athletes and bodybuilders, "are under the impression, perpetuated by the likes of [GNC] here, that a supplemented intake of glutamine has beneficial effects." (*Id.* at ¶¶ 9–10.) While Plaintiff concedes that "[g]lutamine naturally found within the body does play a role in certain mechanisms supporting muscle growth, recovery and immunity support," he claims that "glutamine supplementation has been found to be completely ineffective at mimicking these physiological responses." (*Id.* at ¶ 12.) In short, Plaintiff alleges that "the ingestion of GNC's Products does absolutely nothing for the recovery from exercise, recovery of muscle tissue or ability to decrease muscle wasting (anti-catabolic)." (*Id.* at ¶ 13.)

---

[2] In his complaint, Plaintiff refers to "L-Glutamine" and "Glutamine" interchangeably. (R. 1 at ¶ 6.)

Plaintiff bases his claims regarding the ineffectiveness of glutamine supplements on a number of studies. One study showed that "glutamine failed to affect muscle protein kinetics of the test subjects." (*Id.* at ¶ 26.) In another study "involving healthy humans, glutamine was continuously infused for 2.5 hours at a rate corresponding to .4 grams/kg, which revealed that glutamine did not stimulate muscle protein synthesis." (*Id.* at ¶ 27.) In a third study, researchers investigated the effect of glutamine on the plasma and muscle tissue glutamine concentrations of exercise-trained rates. (*Id.* at ¶ 28.) During the final three weeks of the six-week study, one group of rats received a daily dose of glutamine. (*Id.*) While "[t]he plasma and muscle glutamine levels were higher than placebo during the post-exhaustive recovery period," the "increase had no effect on the exercise swim test to exhaustion performance, which means that elevations in plasma and muscle glutamine levels have no benefit on muscle performance." (*Id.*)

A fourth study investigated "the effect of oral glutamine supplementation combined with resistance training in young adults." (*Id.* at ¶ 29.) Subjects received either a placebo or glutamine during six weeks of resistance training. (*Id.*) "Results showed that muscle strength, torque, fat-free mass, and urinary 3-methyl histidine (a marker of muscle protein degradation) all significantly increased with training, but were not different between the groups." (*Id.*)

A fifth study examined "the effects of a combination of effervescent creatine, ribose, and glutamine on muscle strength, endurance, and body composition in resistance-trained men." (*Id.* at ¶ 30.) Subjects performed resistance training for eight weeks and received either a placebo or an experimental supplement containing creatine, glutamine, and ribose. (*Id.*) While both groups of subjects improved muscle strength, endurance, and fat-free mass, the groups were not significantly different from one another. (*Id.*)

A sixth study investigated the effects of creatine monohydrate and glutamine supplementation on body composition and performance measures. (*Id.* at ¶ 31.) Subjects engaged in an eight-week resistance training program and received either a placebo, creatine monohydrate (.3 grams/kg/day for one week and then .03 grams/kg/day for seven weeks), or the same dose of creatine in addition to 4 grams of glutamine per day. (*Id.*) The creatine and the creatine + glutamine groups experienced body mass and fat-free mass increases at a greater rate than the placebo group as well as a greater improvement in the initial rate of muscle power production. (*Id.*) Plaintiff claims that "[t]hese results suggest that the creatine and creatine + glutamine groups were equally effective in producing skeletal adaption to resistance training and that glutamine apparently had no preferential effect in augmenting the results." (*Id.*)

A seventh study examined if high-dose glutamine ingestion affected weightlifting performance. (*Id.* at ¶ 32.) In "a double-blind, placebo-controlled, crossover study, resistance-trained men performed weightlifting exercise one hour after ingesting placebo . . . or glutamine (.3 g/kg)." (*Id.*) According to Plaintiffs, "[r]esults demonstrated no significant differences in weightlifting performance (maximal repetitions on the bench press and leg press exercises), indicating that the short-term ingestion of glutamine did not enhance weightlifting performance in resistance-trained men." (*Id.*)

An eighth study investigated "whether glutamine ingestion influenced acid-base balance or improved high-intensity exercise performance." (*Id.* at ¶ 33.) The "[r]esults showed that blood pH, bicarbonate, and lactate, along with time to fatigue, were not significantly different between supplement conditions, indicating that the acute ingestion of L-Glutamine did not enhance either buffering potential or high-intensity exercise performance in trained males." (*Id.*)

Finally, in the ninth study Plaintiff cites, researchers examined "whether oral glutamine, by itself or in combination with hyperoxia, influenced oxidative metabolism or cycle time-trial performance in men." (*Id.* at ¶ 34.) Subjects received either a placebo or a glutamine supplement one hour before completing a brief high-intensity time-trial. (*Id.*) "The results showed no significant difference in pulmonary oxygen uptake during the exercise test, thereby indicating no effect of glutamine ingestion either alone or in combination with hyperoxia." (*Id.* at ¶ 34.)

Plaintiff claims that "GNC's labeling of the Products was misleading," that he "w[as] in fact misled by GNC's representations regarding the efficacy of the Products," and that he would not have purchased any of the Products had he known that they "did not provide the health benefits as advertised on the label." (*Id.* at ¶¶ 36–37, 39.) He further alleges that "[t]he lack of benefits provided to consumers by the Products fully diminishes the actual value of the Products." (*Id.* at ¶ 38.)

## II.  Plaintiff's Claims and Proposed Classes

Plaintiff indicates in the CAC that he seeks certification of three classes:

- **National Class:** All persons in the United States who purchased the Products.

- **Consumer Fraud Multi-State Class:** All persons in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, and Washington who purchased the Products.

- **Illinois Subclass:** All persons in the State of Illinois who purchased the Products.

(*Id.* at ¶ 48.) In Count I, on behalf of the Consumer Fraud Multi-State Class (the "Multi-State Class"), Plaintiff alleges violations of consumer fraud statutes in the relevant states. (*Id.* at ¶¶ 57–61.) In Count II, on behalf of the Illinois Subclass and in the alternative to Count I,

Plaintiff alleges a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.*  (*Id.* at ¶¶ 62–72.)  In Count III, on behalf of the National Class, Plaintiff alleges breach of express warranty.  In Count IV, on behalf of the National Class and in the alternative to Count III, Plaintiff alleges Unjust Enrichment.  (*Id.* at ¶¶ 73–85.)

**LEGAL STANDARDS**

### I.      Motion to Dismiss Standard

 "A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted."  *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014); *see also Roake v. Forest Preserve Dist. of Cook Cty.*, 849 F.3d 342, 345–46 (7th Cir. 2017).  Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Id.*; *see also Oakland Police & Fire Ret. Sys. v. Mayer Brown, LLP*, __ F.3d __, 2017 WL 2791101, at *3 (7th Cir. 2017).   Put differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  In determining the sufficiency of a complaint under the plausibility standard, courts must "accept all well-pleaded facts as true and draw reasonable inferences in [a plaintiff's] favor."  *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016).

With respect to claims of fraud, Rule 9(b) imposes a higher pleading standard than that required under Rule 8(a)(2). *See Camasta*, 761 F.3d at 736; *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446–47 (7th Cir. 2011). Specifically, "plaintiffs must plead the 'who, what, when, where, and how: the first paragraph of any newspaper story' of the alleged fraud." *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)). In other words, "[t]he requirement of pleading fraud with particularity includes pleading facts that make the allegation of fraud plausible"; therefore, "[t]he complaint must state 'the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014); *see also Rocha*, 826 F.3d at 911. Allegations based on information and belief will not suffice under Rule 9(b) unless "(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides 'the grounds for his suspicions.'" *Grenadyor*, 772 F.3d at 1108 (quoting *Pirelli*, 631 F.3d at 443); *see also United States ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 370 (7th Cir. 2016).

Rule 9(b)'s heightened standard does not, however, apply to allegations of states of mind. *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Instead, Rule 8's standards—as defined in *Twombly* and *Iqbal*— govern. *See Iqbal*, 556 U.S. at 686–87.

## II.    Motion to Deny Class Certification

"At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P.

23(c)(1)(A).  "Consistent with this language, a court may deny class certification even before the plaintiff files a motion requesting certification."  *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011).  A court "need not delay a ruling on certification if it thinks that additional discovery would not be useful in resolving the class determination."  *Id.*

Nevertheless, "[c]ourts generally address class certification at the pleading stage 'only when the class allegations are facially and inherently deficient.'"  *Sullivan v. All Web Leads Inc.*, No. 17 C 1307, 2017 WL 2378079, at *8 (N.D. Ill. June 1, 2017) (quoting *Machowicz v. Kaspersky Lab, Inc.*, No. 14 C 1394, 2014 WL 4683258, at *5 (N.D. Ill. Sept. 19, 2014)).  Thus, "most often it will not be 'practicable' for the court to [determine whether or not to certify a class] at the pleading stage."  *Keith v. Ferring Pharm., Inc.*, No. 15 C 10381, 2016 WL 5391224, at *12 (N.D. Ill. Sept. 27, 20116)

To obtain class certification under Federal Rule of Civil Procedure 23, a plaintiff must satisfy each requirement of Rule 23(a) – numerosity, commonality, typicality, and adequacy of representation – and one subsection of Rule 23(b).  *See McCaster v. Darden Rests., Inc.*, 845 F.3d 794, 800 (7th Cir. 2017); *Harper v. Sheriff of Cook Cty.*, 581 F.3d 511, 513 (7th Cir. 2009).  Plaintiff alleges a class under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting individual members" and that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 373 (7th Cir. 2015); (*see* R. 1 at ¶ 47).  In addition, Plaintiff alleges a class under Rule 23(b)(2), which allows certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  *Chicago Teachers Union, Local No. 1 v. Bd. of*

8

*Educ.*, 797 F.3d 426, 441 (7th Cir. 2015); (*see* R. 1 at ¶ 47).  The Court has "broad discretion to determine whether certification of a class-action lawsuit is appropriate."  *Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 859 (7th Cir. 2017) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 629 (7th Cir. 2001)).

## ANALYSIS

### I.  Motion to Dismiss

#### A.  Plaintiff's Standing for Claims Regarding Products He Did Not Purchase

GNC argues that because Plaintiff alleges in his complaint that he purchased only one of the four Products at issue—Pro Performance L-Glutamine Powder 5000—he lacks standing to assert claims on behalf of putative class members who purchased the remaining three Products. (R. 12, Mem. Supp. Def.'s Mot. Deny Class Cert. & Mot. Dismiss, 11.)  GNC contends, in short, that "Plaintiff appears to be [inappropriately] attempting to 'acquire [standing] through the back door of a class action.'"  (*Id.* (second alteration in original) (quoting *Payton v. Cty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002)).)

Plaintiff's opposition brief and GNC's reply brief make clear that the parties are generally in agreement as to the relevant legal rules at issue.  (*See* R. 18, Pl.'s Opp. Br., 15; R. 21, Def.'s Reply, 8.)  While courts have varying approaches to the question of a plaintiff's standing to sue regarding products he did not purchase, both parties cite *Mednick v. Precor, Inc.*, No. 14 C 3624, 2014 WL 6474915, at *3 (N.D. Ill. Nov. 13, 2014), for the relevant law—a case that follows the approach of a majority of courts.  *See Martin v. Tradewinds Beverage Co.*, CV16-9249 PSG (MRWx), 2017 WL 1712533, at *5 (C.D. Cal. Apr. 27, 2017) (noting the majority rule but also that "[t]here is no controlling authority on whether plaintiffs have standing to sue for products that they did not purchase"); *see also Kelley v. WWF Operating Co.*, No. 17-

cv-117-LJO-BAM, 2017 WL 2445836, at *3 (E.D. Cal. June 6, 2017); 1 *McLaughlin on Class Actions* § 4.28 (13th ed. 2016) (noting that "[c]ourts have disagreed on whether a named consumer plaintiff has standing to sue on behalf of purchasers of a product that he or she did not purchase," but explaining that a "substantial number of courts have decided that a plaintiff may have standing to assert claims on behalf of class members based on products he or she did not purchase as long as the products and alleged misrepresentations about a purchased product are substantially similar").  In *Mednick*, the court explained that the majority of courts that have considered the issue "hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar."  2014 WL 6474915, at *3 (quoting *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 541 (S.D.N.Y. 2013)).  For claims based upon common misrepresentations, the *Mednick* court added, "courts consider not only physical similarities but also the misrepresentations' similarities."  *Id.*; *see also McLaughlin on Class Actions*, *supra*, § 4.28 ("[T]he substantial similarity determination is a context-specific analysis, but frequently entails reference to whether the challenged products are of the same kind, whether they are composed of largely the same ingredients, and whether each of the challenged products bears the same alleged mislabeling.").[3]

    *Mednick* dealt with allegations that the defendant misrepresented the accuracy of heart rate "Touch Sensors" on exercise equipment.  *Id.* at *1, *4.  The court noted that "[m]any of the misrepresentations allegedly were made in the same place and some of the misrepresentations are identical across the nineteen products [at issue in the case]."  *Id.* at *4.  Additionally, the Touch Sensors "fill[ed] the same function on every machine," "they [were] used in the same

---

[3] The Court agrees with the parties and the majority of courts regarding the applicability of the substantial similarity test.

manner on every machine," and they "allegedly fail[ed] in the same manner on every machine by producing inaccurate readings." *Id.* The defendant argued that the products—various exercise machines—were "different mechanically." *Id.* The court rejected this argument because the mechanical differences were not relevant "to the operation or accuracy of the Touch Sensors." *Id.* The defendant also argued that "three different vendors manufacture[d] the Touch Sensors using different designs, software, and algorithms." *Id.* The court rejected this argument as well, noting that although "these differences could be significant, [the defendant] has not shown how, or even claimed that, the Touch Sensors' accuracy or failures varied depending on which vendor made them." *Id.* The defendant therefore "failed to show that these differences [were] anything more than minor." *Id.* Accordingly, the court concluded that the plaintiffs had standing to pursue claims related to all nineteen products. *Id.*

As noted in the Background section, Plaintiff alleges: (1) that the Products contain glutamine; (2) that they indicate they have "Anti-Catabolic Effects," they "Support[] Muscle Function," and/or they "Support[] Faster Recovery After Workouts[4]; (3) based on various scientific studies of the effect of glutamine supplements, the Products' claimed benefits were untrue, rendering the Products effectively worthless; and (4) Plaintiff and the putative class members would not have purchased the Products had they known the truth. Accordingly, based on Plaintiff's allegations, the Products have the same key ingredient of glutamine and all of the Products contain misrepresentations for the same reason: glutamine supplements do not have the benefits indicated on the Products' labels. While the Products have some differences—for example, they come in different forms (a chew or a powder) and different doses (5000 mg like the Product Plaintiff purchased, 2500 mg, or 1500 mg)—nothing in the complaint or the parties'

---

[4] All three of these claims appear on the label of the product Plaintiff purchased. (R. 1 at ¶ 22.) The other three products' labels contain all or some of these claims.

briefs suggests that these differences are material. This case is therefore similar to *Mednick* in that Plaintiff's claims target a single aspect present in an array of different products.

GNC argues that the Products are not substantially similar, vaguely referencing in a single sentence that the Products contain different ingredients, dosages, methodologies of ingestion, labels, packaging, prices, and instructions. (R. 21 at 8.) GNC fails to explain, however, how any of these differences are material. Moreover, based on the allegations in the CAC, the Products are substantially similar—they contain the same active ingredient, are sold by the same company, and all contain labels including some or all of the claimed benefits listed on the Product Plaintiff purchased. In sum, similar to the plaintiff in *Mednick*, Plaintiff has adequately alleged standing for claims based on all Products given that he has alleged the products are essentially materially the same.[5] *See also Martin*, 2017 WL 1712533, at *5 (finding substantial similarity); *Vass v. Blue Diamond Growers*, No. 14-13610-IT, 2015 WL 9901715, at *7 (D. Mass. Aug. 11, 2015) (concluding that the allegations in a complaint demonstrated sufficient similarity because the products were "the same in nature, i.e., Blue Diamond Almond

---

[5] The cases GNC cites in support of its position are distinguishable. (*See* R. 12 at 11–12.) *Muir v. NBTY, Inc.*, No. 15 C 9835, 2016 WL 5234596, at *4 (N.D. Ill. Oct. 26, 2015), involved five different distributors of a supplement, and the Plaintiff did not allege that the products' "formulations are identical or that the discrepancy between the stated amounts and actual amounts of hypericin was the product of a single decision or policy." Here, in contrast, GNC is the sole defendant, all of the Products key ingredient is glutamine, and the allegations are that glutamine supplements are effectively worthless. The Court concludes that the current case resembles *Mednick* more than *Muir*.

Similarly, *Gubala v. Allmax Nutrition, Inc.*, No. 14 C 9299, 2015 WL 6460086, at *3 (N.D. Ill. Oct. 26, 2015), dealt with two products containing different types of protein, different amino acids and other non-protein ingredients, and "Plaintiffs' arguments as to what makes each product's label misleading [were] different." In the current case, Plaintiff's arguments about what makes the Products' labels misleading are the same, and all of Plaintiff's claims concern whether glutamine supplements have the effects claimed on the Products' labels.

*Padilla v. Costco Wholesale Corp.*, No. 11-cv-4686, 2012 WL 2397012, at *3 (N.D. Ill. 2012), did not conduct an analysis under the substantial similarity test and the court noted that the two products had "different product formulations and labels." In the current case, the parties agree that the substantial similarity test applies, and the allegations in the complaint indicate that, as in *Mednick*, the Products are substantially similar as they relate to Plaintiff's claims. Finally, *Pearson v. Target Corp.*, No. 11 CV 7972, 2012 WL 7761986, at *1 (N.D. Ill. Nov. 9, 2012), simply relies on *Padilla* and does not apply the substantial similarity test. It is not instructive in the current case given the parties' arguments.

milk products[] have many of the same ingredients including almond milk, and are all labeled 'All Natural' when they purportedly are not"), *report and recommendation adopted*, No. 14-CV-13610-IT, 2016 WL 1275030 (D. Mass. Mar. 31, 2016); *Clay v. Cytosport, Inc.*, No. 15-cv-165 L(DHB), 2015 WL 5007884, at *7 (S.D. Cal. Aug. 19, 2015) ("In light of the alleged similarity of ingredients, labels, and misrepresentations at issue in this case, the Court refuses to dismiss the class claims for lack of standing." (citation omitted)); *Garrison v. Whole Foods Mkt. Grp., Inc.*, No. 13-cv-5222-VC, 2014 WL 2451290, at *5 (N.D. Cal. 2014); *Quinn*, 958 F. Supp. 2d at 542 ("[T]here are substantial similarities between all of defendants' Glucosamine Supplements, and the alleged misrepresentations on the labels of the Glucosamine Supplements are nearly identical."); *Jovel v. i-Health, Inc.*, No. 12-CV-5614 (JG), 2013 WL 5437065, at *10 (E.D.N.Y. Sept. 27, 2013) (finding substantial similarity among products where "[t]he crux of the alleged misrepresentation—that algal DHA provides brain health benefits—is the same" and where the plaintiff alleged "that the three products have the same core active ingredient—algal DHA").

### B.    The Sufficiency of Plaintiff's Allegations Under Rules 8(a) and 9(b)

The ICFA "protects consumers against 'unfair or deceptive acts or practices," such as fraud and the misrepresentation of any material fact.  815 ILCS 505/2; *see Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012); *Blankenship v. Pushpin Holdings, LLC*, No. 14 C 6636, 2015 WL 5895416, at *6 (N.D. Ill. Oct. 6 2015).  For Plaintiff to properly state his ICFA claim based on alleged deception, he must show "(1) the defendant committed a deceptive act or practice; (2) the defendant intended for the plaintiff to rely on the deception; (3) the deception happened in the course of trade or commerce; and (4) the deception proximately caused the plaintiff's injury."  *Cocroft v. HSBC Bank USA, N.A.*, 796 F.3d 680, 687 (7th Cir. 2015); *see also*

*Great Lakes Reinsurance (UK) v. 1600 W. Venture, LLC*, No. 16 C 2145, 2017 WL 2559061, at
*5 (N.D. Ill. June 13, 2017).

GNC argues that Plaintiff's ICFA claim (Count II of the CAC as well as part of Count I)
fails to satisfy Rules 8(a) and 9(b) because (1) the studies upon which Plaintiff relies in the CAC
are inadequate to support his ICFA claim (specifically, Plaintiff has not alleged facts supporting
his claim that the Products' labels contain false information), and (2) Plaintiff "has failed to
sufficiently allege 'how' the representations [on the Products' labels] were fraudulent." (*Id.* at
12–15.) Plaintiff contends that he "provided highly particularized allegations in support of his
ICFA claim, along with specific scientific citations, demonstrating that the Products' labels
mislead consumers by advertising that the Products have 'Anti-Catabolic Effects,' 'Support
Muscle Function' and 'Support Faster Recovery After Workouts.'" (R. 18 at 19 (quoting R. 1 at
¶ 35).) The Court agrees with Plaintiff.

Taking the allegations in the CAC as true, Plaintiff has adequately alleged that glutamine
supplements do not improve recovery, muscle function, or muscle wasting. Accordingly,
Plaintiff has adequately alleged that the Products' labels contain false information. Plaintiff cites
a number of studies[6] that support the proposition that glutamine supplementation has no effect on
muscle performance or strength, muscle growth, recovery, or performance during exercise. (*See,
e.g.*, R. 1 at ¶ 29 (finding in a six-week study no significant effect on muscle strength,
performance, body composition, or muscle protein degradation in young adults); *id.* at ¶ 30
(finding in an eight-week study that glutamine supplements had no significant effect on muscle
strength or endurance); *id.* at ¶ 31 (finding in an eight-week study that glutamine supplements
did not significantly improve "the initial rate of muscle power production"); *id.* at ¶ 32 (finding

---

[6] GNC does not cite the studies referenced in Plaintiff's complaint to contend that Plaintiff has misrepresented the
methodologies or results. At this stage of the litigation, the Court accepts for the purposes of the current motion
Plaintiff's uncontested representations regarding the studies cited in the CAC.

that glutamine supplements did not enhance weightlifting performance); *id.* at ¶ 33 (finding that glutamine supplementation did not enhance buffering potential or high-intensity exercise performance); *see also id.* at ¶ 27 (finding that glutamine supplementation "did not stimulate muscle protein synthesis"); *id.* at ¶ 28 (finding in a six-week study on rats that glutamine supplementation had "no benefit on muscle performance").  These studies sufficiently support Plaintiff's claims at this stage of the litigation, notwithstanding GNC's challenge to Plaintiff's definition in the CAC of "recovery" and "anti-catabolic," which the Court must take as true. (*See* R. 1 at ¶ 24; R. 21 at 11.)[7]

The Court rejects GNC's arguments that Plaintiff cannot rely on the studies because they do not involve the Products, their specific dosages, and their methods of ingestion.  (R. 12 at 12.) Plaintiff's allegations boil down to a claim that glutamine in supplement form does not have the benefits listed on the Products' labels.  As alleged, the studies support this claim.  The cases GNC cites in support of its argument that the studies cited in the CAC are irrelevant are distinguishable.  (*See* R. 12 at 12–13.)  In *Padilla v. Costo Wholesale Corp.*, the court faulted the plaintiff for failing to cite to studies involving the two key ingredients listed on a product's labels.  *See* No. 11 C 7686, 2013 WL 195769, at *3 (N.D. Ill. Jan. 16, 2013) ("[N]one of the clinical studies Padilla cites assess the effectiveness of glucosamine *and* MSM." (emphasis in original)).  Additionally, the studies the plaintiff cited dealt with the use of glucosamine and chondroitin to treat osteoarthritis, but the allegedly false label for the "Glucosamine with MSM" product did "not claim to be effective for the treatment of osteoarthritis."  *Id.*  Unlike in *Padilla*, the studies at issue concern the only active ingredient in the Products (at least according to

---

[7] GNC does not offer an alternative definition beyond stating that the Court should "use the plain language."  (R. 21 at 11.)  Additionally, GNC did not challenge Plaintiff's definitions in its opening brief.  Arguments raised in a reply brief for the first time are waived.  *Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 897 (7th Cir. 2017).

Plaintiff's allegations) and they implicate glutamine's efficacy with respect to the claims on the Products' labels.

Toback v. GNC Holdings, Inc., No. 13-80526-CIV, 2013 WL 5206103, at *5 (S.D. Fla. Sept. 13, 2013), is similar. There, the court noted that the product at issue contained many more ingredients than the two ingredients that the complaint examined with "laser-like focus." 2013 WL 5206103, at *5. Accordingly, "Plaintiff's allegations regarding the inefficacy of glucosamine and chondroitin simply fail[ed] to address the efficacy of the TriFlex Vitapak's multifarious composition." Id. In the current case, as previously discussed, the complaint focuses on glutamine, and the Products at issue are glutamine supplements rather than supplements with many other key ingredients not addressed in any cited studies. See also Eckler v. Wal-Mart Stores, Inc., No. 12-CV-727-LAB-MDD, 2012 WL 5382218, at *6–7 (S.D. Cal. Nov. 1, 2012) (noting that the product at issue "contains a number of ingredients" beyond the ingredients at issue in the studies the plaintiff cited, and explaining that the studies dealt with osteoarthritis when the product packaging did not include claims that the product was an effective treatment for osteoarthritis).

Finally, Brown v. GNC Corp., 789 F.3d 505 (4th Cir. 2015), is also distinguishable. There, the plaintiffs "concede[d] that, although most duly qualified scientific experts may agree that glucosamine and chondroitin are ineffective, some reasonable experts disagree and believe that glucosamine and chondroitin can provide the symptom relief promised by the Companies." 789 F.3d at 515. In other words, the court explained, the plaintiffs failed to allege the falsity of the representations because of their concession. Id. ("When litigants concede that some reasonable and duly qualified scientific experts agree with a scientific proposition, they cannot also argue that the proposition is 'literally false.'"). The plaintiffs in GNC effectively pled

16

themselves out of court.  Plaintiff in this case has not done the same, and GNC does not contend

that Plaintiff has alleged that some studies support the claims on the Products' labels.

In short, the studies support the allegation that glutamine supplements do not have the

benefits claimed on the Products' labels.  Unlike in the cases GNC cites above, the complaint

does not indicate that there are extra active ingredients in the Products that the cited studies do

not address.  Additionally, unlike in the cases just discussed, the studies as alleged in the CAC

address the Products' alleged misrepresentations.  Viewing the allegations in the light most

favorable to Plaintiff, Plaintiff's allegations are sufficient.  *See id.* at 517 ("The applicability of a

study regarding different dosages of the same ingredients to the products at issue is not

susceptible to resolution at the motion-to-dismiss stage."); *Vasic v. PatientHealth, L.L.C.*, 171 F.

Supp. 3d 1034, 1040 (S.D. Cal. 2016) (distinguishing *Eckler*); *Quinn*, 958 F. Supp. 2d at 544;

*Bronson v. Johnson & Johnson, Inc.*, No. 12-04184 CRB, 2013 WL 1629191, at *9 (N.D. Cal.

Apr. 16, 2013); *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*,

955 F. Supp. 2d 1311, 1344 (S.D. Fla. 2013); *Pearson*, 2012 WL 7761986, at *2 ("[W]hether or

not the proffered studies are applicable to Up & Up Triple Strength is a question of fact that I do

not decide at this stage.  The fact that these studies looked at products that shared the same active

ingredients . . . makes Plaintiff's claim facially plausible.").

The Court also rejects GNC's argument that Plaintiff "has failed to sufficiently allege

'how' the representations are fraudulent."  (R. 21 at 12.)  As described above, Plaintiff

adequately alleges the falsity of the Products' representations.  Additionally, Plaintiff adequately

alleges that these representations misled him and that he would not have purchased the GNC's

glutamine supplement if he had known the truth.  By including the relevant labels in the CAC,

alleging what the information on the labels means, alleging the results of the various scientific

studies, and alleging how the information on the labels deceived him, Plaintiff has met his pleading burden. *See, e.g.*, *In re Rust-Oleum Restore Mktg., Sales Practices & Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 812–13 (N.D. Ill. 2016) (explaining (1) that a plaintiff satisfies Rule 9(b) by providing a general outline of the fraud scheme sufficient to reasonably notify defendants of their purported role, and (2) that the plaintiffs met their burden); *Aliano v. Louisville Distilling Co., LLC*, 115 F. Supp. 3d 921, 930 (N.D. Ill. 2015).[8]

## II.      Motion to Deny Class Certification

GNC asks the Court to deny class certification on the pleadings. Specifically, it contends that the National Class and the Multi-State Consumer class are inappropriate based on variations in the law from state to state. (R. 12 at 6–10.)

In this case, it is premature to determine the propriety of class certification at the motion-to-dismiss stage. First, courts have denied similar motions before class discovery, the plaintiff's motion for certification, and the benefit of full briefing on the issue of class certification. *See, e.g.*, *Bietsch v. Sergeant's Pet Care Prods., Inc.*, No. 15 C 5432, 2016 WL 1011512, at *11 (N.D. Ill. Mar. 15, 2016) (declining to deny class certification in case alleging breach of warranty and fraud based on variations in state law); *Rysweyk v. Sears Holdings Corp.*, No. 15 CV 4519, 2015 WL 9259886, at *8 (N.D. Ill. Dec. 18, 2015) (denying a motion to strike class allegations based on a nationwide class, and noting that while the "[p]laintiffs might not carry their burdens at class certification, . . . nothing in the complaint or defendants' explanation of the law persuades me that it is practicable to resolve the certification question at this stage"); *Mednick*, 2014 WL 6474915, at *7 (explaining that even if material variations in state law existed applicable to a multi-state class, they "would not justify striking the class allegations"); *In re*

---

[8] GNC limited its arguments regarding Rules 8 and 9 to the ICFA claim. To the extent GNC argues that Plaintiff's other claims fail because Plaintiff has not adequately alleged the falsity of the Products' labels representations, the Court rejects GNC's argument.

*Canon Cameras*, No. 05 Civ. 7233(JSR), 2006 WL 1751245, at *1 (S.D.N.Y. June 23, 2006) (denying a motion to strike class allegations based on the need to apply the law of "nearly all the states" because "the existence of variation in the applicable state law does not necessarily mean that common issues of fact and law will not predominate, especially if the state laws treat the most important issues in the case in essentially identical fashion").

Second, even assuming there are material differences in applicable state law, it may be prudent to create subclasses based on similarities in various states' laws. Roadblocks to class certification "can and often should be solved by refining the class definition rather than by flatly denying class certification." *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). Indeed, in *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 363 (7th Cir. 2012) (*Butler I*),[9] the Seventh Circuit reversed the district court's denial of class certification and noted that "the district court will want to consider whether to create different subclasses of [a class] for the different states," depending on whether "there are big enough differences among the relevant laws of those states to make it impossible to draft a single, coherent set of jury instructions should the case ever go to trial before a jury." *See also Butler II*, 727 F.3d at 802 (explaining that complications arising from differing state laws "can be handled by the creation of subclasses). Given that subclasses potentially could resolve problems arising from differences in state law, it is practical to wait until Plaintiff moves for class certification, proposes subclasses, and the parties provide in-depth analysis of the issues relevant to class certification.

Third, at least as alleged, there are major issues in this case that are likely susceptible to classwide proof. The question of whether the Products' labels are indeed false is perhaps the most important question in this case and the most difficult to answer, as it will likely require

---

[9] The Supreme Court vacated this opinion and remanded it for further consideration in light of intervening Supreme Court precedent. *See Sears, Roebuck & Co. v. Butler*, 133 S. Ct. 2768 (2013). Upon remand, the Seventh Circuit reinstated its judgment. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) (*Butler II*).

expert testimony. Based on the CAC, this question is likely susceptible to common proof—that is, it can be resolved in "one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, N.Y.U. L. Rev. 97, 132 (2009)).

Finally, while GNC points to some differences in state law, it does not show how those differences necessarily preclude class certification so that it is "practicable to resolve the certification question at this stage." *Rysewyk*, 2015 WL 9259886, at *8; *see also Bietsch*, 2016 WL 1011512, at *11. GNC does not explain how the differences in state law it identifies are material based on the pleadings, particularly in light of the broad discretion courts have under Rule 23 to "devise 'imaginative solutions' to resolve problems created by class actions." *See Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 888 (7th Cir. 2011) (quoting *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)); *Mulvania*, 850 F.3d at 859. Whether to create subclasses will likely be a central issue during class-certification proceedings.[10] It is sensible to wait to conduct the relevant analysis until the issues are fully briefed and the record is fully developed. Despite the Court's denial of the current motion, however, Plaintiff should take care in defining his proposed classes and subclasses in his motion for class certification.

---

[10] Indeed, GNC's argument regarding the breach of warranty claim identifies three approaches under state law. (R. 12 at 6–8.) This suggests that creating subclasses may be appropriate. The cases GNC cites regarding unjust enrichment came after a motion for class certification. *See In re Aqua Dots Prods. Liab. Litig.*, 270 F.R.D. 377, 387 (N.D. Ill. 2010); *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 586 (N.D. Ill. 2008). Additionally, some courts have certified multi-state classes in unjust-enrichment cases, *see, e.g.*, *In re Abbott Labs. Norvir Anti-Trust Litig.*, Nos. C 04-1511 CW, C 04-4203 CW, 2007 WL 1689899, at *9–10 (N.D. Cal. June 11, 2007), although the Court cautions that a nationwide class may not ultimately be suitable in the current case. Finally, with respect to the Multi-State Class, the Seventh Circuit recently affirmed the certification of a consumer fraud class involving the law of the same ten states included in the Multi-State Class. *See Mullins v. Direct Dig., LLC*, 13-CV-1829, Dkt. 45 (N.D. Ill. Feb. 18, 2014); *Mullins v. Direct Dig.*, No. 13 CV 1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015).

## CONCLUSION

For the foregoing reasons, the Court denies GNC's motion.

**Dated:** **July 19, 2017**

**ENTERED**

_____
AMY J. ST. EVE
United States District Court Judge